FILED

2016 Sep-28  PM 04:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JOE D. JOHNSON,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| **vs.** | ) | Civil Action Number |
| | ) | **5:14-cv-2131-AKK** |
| **REED CONTRACTING** | ) | |
| **SERVICES, INC.,** | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

Joe D. Johnson brings this action against Reed Contracting Services, Inc., for alleged gender and race discrimination, in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. Doc. 1. Reed Contracting moves for summary judgment, challenging whether Johnson can establish a prima facie case of race or sex discrimination, and, alternatively, contending that it has a legitimate, non-discriminatory reason for its decision to discharge Johnson. Doc 16 at 22, 25. Reed Contracting's motion is fully briefed and ripe for review. Because Reed Contracting had a reasonable basis to believe that Johnson threatened his co-workers, the motion is due to be granted.[1]

---

[1] Reed Contracting also moves to strike portions of a witness's affidavit Johnson submitted. Doc. 25 at 1. Under the sham affidavit doctrine, a court can strike an affidavit that contains an "inherent consistency" with the affiant's prior sworn testimony. *Van T. Junkins & Assocs. v. U.S Indus., Inc.*,

## I.   STANDARD OF REVIEW

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (alteration in original). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-moving party, who is required to go "beyond the pleadings" to establish that there is a "genuine issue for trial." *Id*. at 324 (internal citations and quotation marks omitted). A dispute about material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court must construe the evidence and all reasonable inferences arising from

---

736 F.2d 656, 658 (11th Cir. 1984). The motion is **DENIED** as far as it relates to the conversation between the witness and Shawn Rice, because the affidavit and the email are not inherently contradictory, and, as Reed Contracting concedes, the email was not sworn testimony. Doc. 25 at 6. The motion to strike is also **DENIED** because the court did not rely on the witness's testimony in deciding whether Reed Contracting engages in discrimination.

it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 244 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual dispute will be resolved in the non-moving party's favor when sufficient competent evidence supports that party's version of the disputed facts. *See Pace v. Capobianco*, 238 F.3d 1275, 1276–1278 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (citing *Bald Mountain Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that a jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (1lth Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II.    FACTUAL ALLEGATIONS

Johnson, who is male and African American, worked for Reed Contracting as a dump truck driver from May 2013 until his discharge in February 2014. Docs. 16 at 5; 19-1 at 39, 43.  Relevant here, Reed Contracting's work rules prohibit the use of foul or offensive language, and "[t]hreats, threatening and abusive behavior, or acts

3

of violence against employees . . . on company property." Doc. 18-2 at 22. A violation of the policy leads to "corrective action up to, and including, termination and/or referral to the [proper authorities]." *Id.* at 22. An employee who "makes threats, exhibits threatening behavior, or engages in violent acts on company premises shall be removed from the premises as quickly as safety permits" and is not allowed back during the investigation. *Id.* After the investigation, Reed Contracting will "initiate an immediate response [which may include] suspension and/or termination of employment." *Id.* Generally, under Reed Contracting's progressive disciplinary system, the first step is a verbal discussion about the unacceptable behavior and necessary changes the employee needs to make, followed by a written warning, and, finally, a suspension or termination. Doc. 19-3 at 3. However, "[a]n employee may be terminated immediately in certain situations . . . that could be interpreted as an immediate threat to the company or its employees." *Id.* Finally, Reed Contracting can only deviate from these procedures with the approval of its vice president or president. *Id.*

Johnson worked for Reed Contracting without incident until Saturday, February 1, 2014. The events that triggered Johnson's discharge began when Reed Contracting instructed Johnson to transport an additional "load back and [dump] it on the east side of the bridge." Doc.17-1 at 16. When Johnson arrived to pick up the

4

second load, Angel McKinley, a white female dump truck driver who usually transported the last truck load of the day, told Johnson over the communication radio that he "better not get loaded" because she was supposed to be "the last truck." *Id.* Immediately following McKinley's comments, Johnson received a call from Tammy Woods, a dispatcher who filled in on Saturdays for trucking foreman Scott Sterling as Johnson and McKinley's supervisor. Docs. 17-1 at 16-17; 20-3 at 1; 20-1 at 1. Woods, who sounded "a little angry," inquired why Johnson was on Highway 72 instead of Highway 20. Doc. 17-1 at 16. After denying being on Highway 72, based on his belief that McKinley had called Woods and lied about Johnson's whereabouts because there was "no way [Woods] could have seen him" on Highway 72, Johnson told Woods that McKinley needed to "stay out of [his] business." *Id.* at 17; doc. 20-3 at 1.

Chris Baker, one of Johnson's co-workers, heard McKinley's purported "threat to [Johnson] about . . . not taking load from the airport" over the radio. Docs. 19-3 at 4; 23-3 at 2.  After Johnson's conversation with Woods, Johnson called Baker and was still on the phone with Baker when Johnson arrived at the operations building. Docs. 17-1 at 17; 19-3 at 4. While fueling his truck, Johnson saw McKinley "walking from [her] truck and going into the [operations] building." Doc. 17-1 at 17.  With roughly twenty to thirty feet separating them, docs. 17-1 at 18; 19-3 at 6, Johnson told

McKinley that he would "appreciate [her] staying out of [his] business, because [Woods] had called [him]," doc. 17-1 at 17. Baker, who heard this comment over the telephone, stated that McKinley responded by "cuss[ing] at [Johnson]." Docs. 17-1 at 17; 19-3 at 4. Allegedly, McKinley told Johnson that she was not "in his fucking business and frankly [didn't] give a shit," which prompted Johnson to tell McKinley again that she was in "[his] fucking business" and needed to stay out of it. Docs. 17-1 at 17–18; 20-7 at 6; 19-3 at 4; 23-3 at 2.

The two witnesses to this incident paint a different picture. Bobby Sims, whom Johnson identified as a witness, *see* doc. 20-1 at 4, claims that when "[McKinley] walked by, [Johnson] started screaming at her [that she was] a fucking bitch [and that] he was going to kill her." Doc. 20-6 at 1. Sims also claims that he did not hear McKinley threaten, yell, or curse at Johnson. *Id.* at 2. Omarr Nelson, the other witness, claims that he heard "something that sounded like a male voice yelling and cursing in a very loud voice" when he was at "the parking lot across the street and on the other side of the yard." Doc. 20-5 at 1.

After this exchange, McKinley entered the operations building, while Johnson purportedly stayed outside to work on his daily paperwork. Doc. 17-1 at 17–18. Once inside, McKinley told Woods that Johnson "had been yelling and cursing at her" and "that she had not done anything to set [him] off." Doc. 20-3 at 2. As Johnson tells it,

6

when he subsequently entered the office, Woods met Johnson at the door and asked Johnson why he was "fussing" at McKinley. Doc. 17-1 at 18–19. McKinley, who stood behind Woods about ten to fifteen feet away from Johnson, allegedly told Johnson that "he did not know who he was messing with" and that she "could get him fired." *Id.* at 18. Johnson continued to fill out his paperwork as Woods and McKinley continued talking to him. *Id.* The exchange ended when Woods arranged for another employee to escort McKinley outside under the pretense of helping another driver. *Id.* at 18–19; doc. 20-3 at 2–3 (Woods stating that "To try and get Mr. Johnson away from Ms. McKinley, I called another driver . . . and asked her to take Ms. McKinley away from the yard because I was concerned about her safety because [Johnson] stated that he would kill her.").

Unlike Johnson's account, the witnesses again paint a different picture. Nelson reported that when Johnson followed McKinley into the operations building, he decided to follow Johnson "into the operations building because [he] was concerned that Mr. Johnson might physically assault Angel [McKinley] or Tammy Woods [the dispatcher]." Doc. 20-5 at 1–2. As for Woods, she described the exchange in the office as follows:

> Then, around 3 [p.m.] . . . McKinley came in to the operations building. She was crying and said that Mr. Johnson had been yelling and cursing at her. Ms. McKinley

> said that she had not done anything to set Mr. Johnson off.
> . . . The next thing I knew Mr. Johnson had entered the
> operations building. He was shaking with anger and
> continued yelling and screaming at Ms. McKinley . . . Mr.
> Johnson said such things as Ms. McKinley "didn't know
> who she was messing with," and "I will get you back
> bitch." He was also saying, "you don't know me, I will kill
> you."

Doc. 20-3 at 2.

Based on Johnson's outburst and threats, Woods " was concerned for [her own] safety and for the safety of Ms. McKinley." *Id.* Consequently, Woods called Shawn Rice, the Human Resources Manager, and informed him that "[Johnson] had been screaming at, cursing at, and threatening [McKinley]," and that Omarr Nelson witnessed the incident. Docs. 20-1 at l; 20-3 at 2 (Woods stating, in part, that she told Rice "that Mr. Johnson threatend Ms. McKinley by saying that she 'did not know who whe was messing with' and 'I will get you back bitch.'"). Rice in turn, called David Wilkinson, the Human Resources/Safety Director, and relayed the complaint from Woods. Docs. 20-1 at 1; 20-2 at 1, 3. Wilkinson asked Rice to investigate the incident because Rice "often [conducted] investigations for [Wilkinson] . . . and [provided Wilkinson] with [an] investigative report [so Wilkinson could choose what] action to take." Docs. 20-2 at 1, 3; 20-1 at 2.

Rice conducted the investigation on Monday, February 3, 2014, which entailed meeting with McKinley and Johnson, and Nelson and Sims. Docs. 20-1 at 1–2; 19-2 at 25; 19-3 at 2. Rice met first with McKinley for about thirty to thirty-five minutes

and asked Sterling, the trucking foreman, to sit in during the meeting. Doc. 20-1 at 2.  For her part, McKinley relayed to Rice that Johnson "started yelling and cursing at her when she was in the yard" and that Johnson  "followed her into the operations building while continuing to yell and curse at her." *Id.* McKinley denied cursing or raising her voice at Johnson, and claimed that Johnson "threatened her" by telling her she was not his boss, that she "did not know who [she was] messing with," and that he would get the "bitch" back. *Id.*

In light of McKinley's contention, Rice called Wilkinson. *Id.*  Based on Rice's summary of his conversation with McKinley and Woods' earlier report, Wilkinson instructed Rice to "meet with Mr. Johnson and to suspend him while the investigation was finished," *id.*, because "[f]rom what Tammy [Woods] and Angel [McKinley] said, Mr. Johnson was the aggressor,"  doc. 20-2 at 3. Wilkinson maintains he wanted to "make sure [Johnson] was interviewed and all witnesses were questioned" before making any "final decisions." Doc. 20-2 at 3.

Rice met next with Johnson, who, unbeknownst to Rice, recorded the entire conversation because Johnson was "not comfortable with the way things were going." Docs. 17-1 at 20; 20-1 at 3. In fact, Johnson claims that Rice "seemed to already have his mind made up" when Rice met with him. Doc. 17-1 at 20. At some point, Rice informed Johnson that several witnesses "heard [Johnson] hollering on the yard about I'll get you back, I'll get even." Docs. 20-7 at 8; 20-1 at 3. Johnson denied making the threats, but did not deny hollering at McKinley. Doc. 20-7 at 8–9. Perhaps because he wanted to point out that McKinley acted inappropriately also, Johnson asked Rice

9

if it was okay for McKinley to scream at Johnson. *Id.* In response, Rice stated that he planned "to deal with [McKinley] too" because "it [was not] okay for neither one of [them] to scream." *Id*.

At some point, Rice informed Johnson of Wilkinson's decision to suspend Johnson during the investigation by stating that "until [he got] to the bottom of [the altercation], we going to take a couple of days off and cool down." *Id.* Although Rice conveyed that he planned to obtain written statements about the incident from everyone, he added that based on his investigation at that point "it didn't sound good" for Johnson because "four or five" people, including one supervisor, deemed Johnson's behavior "threatening." *Id.* at 9, 11–12. Johnson voiced his displeasure with the decision by noting that Rice was not suspending McKinley – stating that McKinley "[wasn't taking] a couple of days off. She's running [i.e. working] now," *id.* at 12, and that the "three or four other witnesses" who said that Johnson threatened McKinley "[were] lying," *Id.* at 16–17.

Rice met next with Nelson. Doc. 20-1 at 3. In addition to Nelson conveying a version of the incident that mirrored McKinley and Woods' accounts, Nelson reported that Johnson had also threatened him earlier that morning: "Then, on Monday morning, . . . Mr. Johnson walked up to me and told me that I would need to call the police if I did not stay out of his business." Doc. 20-5 at 2. Nelson added that he "was concerned by Mr. Johnson's comment and took it as a threat." *Id.*

After meeting with Nelson, Rice called Bobby Sims, whom "Johnson had indicated . . . was outside the operations building" during the incident.  Doc. 20-1 at

10

4.  Sims described the encounter in a manner consistent with the other witnesses: "Mr. Sims told me that Mr. Johnson was yelling at Ms. McKinley . . . [and] that he heard Mr. Johnson say he would get [Ms. McKinley] and that she was a 'fucking bitch.'" *Id.*; *see also* doc. 20-6.

After his investigation, Rice prepared a memorandum for Wilkinson in which he summarized his findings and described Johnson as "very defensive and aggressive." Doc. 19-3 at 9.   In addition to conveying that everyone described Johnson as the instigator and mentioning some of the threats Johnson directed at McKinley, Rice added also that Johnson had recently threatened Nelson.[2] *Id.* The same day he received Rice's report, i.e. February 3, Wilkinson instructed Rice to discharge Johnson for violating the violence policy by threatening Nelson and McKinley. Docs. 19-2 at 25; 20-2 at 1, 3. As a result, the next day, Rice informed Johnson of the decision to discharge him. Docs. 17-1 at 21; 19-2 at 22.

## III.   ANALYSIS

Johnson claims Reed Contracting discharged him because of his race and gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. "Both [Title VII and § 1981] have the same requirements of proof and use the same analytical framework, therefore [the court]

---

[2] Rice testified that Johnson violated the violence in the workplace policy based initially on his conduct towards McKinley, and a second time when Johnson "walked up to [Nelson] and told [Nelson] that [Nelson] would need to call the police if [Nelson] did not stay out of his business." Doc. 20-5 at 2. Rice did not raise this allegation when he met with Johnson because he had not yet learned about it. Doc. 19-2 at 15. Johnson denies threatening Nelson, and maintains that he only learned about this additional reason after his discharge. Docs. 17-1 at 46; 22 at 4.

shall explicitly address the Title VII [race and gender] claim[s] with the understanding that the analysis applies to the § 1981 [race] claim as well." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998). Where, as here, Johnson is relying on circumstantial evidence, the court applies the *McDonnell Douglas* burden-shifting standard. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313 (11th Cir. 2003). Under this standard, if Johnson successfully makes a prima facie case, the burden shifts to Reed Contracting to provide a legitimate, non-discriminatory reason for the discharge. *McDonnell Douglas*, 411 U.S. 792 at 793; *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010); *Jones v. Gerwens*, 874 F.2d 1534, 1538 (11th Cir. 1989). If Reed Contracting meets its burden, the burden shifts back to Johnson to show pretext. *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1528–1529 (11th Cir. 1987). If Johnson cannot make a prima facie case or cannot show that Reed Contracting's articulated reason is pretext for discrimination, then the court must find for Reed Contracting. *See Maniccia v. Brown*, 171 F.3d 1364, 1370 (11th Cir. 1999).

To establish a prima facie case, Johnson must prove by a preponderance of the evidence that "(l) he is a member of a protected class, (2) he was qualified for the position, (3) he suffered an adverse employment action, and (4) he was replaced by a person outside his protected class" or that Reed Contracting "treated [him] less favorably than a similarly situated individual outside his protected class." *McDonnell Douglas*, 411 U.S. at 793; *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1289 (11th Cir.

2003). The parties agree that Johnson is in a protected class and suffered an adverse action. As to the second prong, since this is a termination case and Johnson held his position for a "significant period of time," i.e. from May 23, 2013 to February 4, 2014, the court assumes that Johnson was qualified for this position. *See Crapp v. City of Miami Beach Police Dep't*, 242 F.3d 1017, 1020 (11th Cir. 2001); *Rosenfield v. Willington Leisure Products, Inc.*, 827 F.2d 1493, 1495 n.2 (11th Cir. 1987). As such, the only issue of contention with respect to the prima facie case is whether Reed Contracting replaced Johnson with a female or a Caucasian, or treated Johnson less favorably than a similarly situated individual who is not in his protected class. In resolving the latter issue, the court notes generally that "[w]hen an individual proves that he was fired but one outside his class was retained although both violated the same work rule, this raises an inference that the rule was discriminatorily applied against that individual, regardless of the race [or gender] of the replacement." *Nix v. WLCY Radio/Rahall Comm.*, 738 F.2d 1181, 1185 (11th Cir. 1984). However, to rely on a comparator, Johnson must show that he is "similarly situated [to the comparator] . . . in all relevant aspects." *Knight*, 330 F.3d at 1316.

A.   *Johnson cannot show that Reed Contracting treated him less favorably than similarly situated employees*

Johnson identified five individuals as purported comparators. Doc. 17-1. For the reasons stated herein, none of these individuals is similarly situated to Johnson. First, Johnson claims that Reed Contracting failed to discipline Lee Master and Ron Parker, two Caucasian drivers, for an altercation that escalated to the point where

Master brandished a knife. Doc. 17-1 at 25.  Johnson cannot rely on this incident, however, to establish disparate treatment because he does not contest Reed Contracting's contention that no one reported this incident (which occurred before Johnson's employment ) to Human Resources. *Id*. at 49; doc. 20-2 at 7. Likewise, Johnson cannot rely on an incident involving Melanie Nevallis and Master, two Caucasian drivers, who purportedly engaged in an altercation in early 2014 that included Master threatening Nevallis. Docs. 17-1 at 49; 19-1 at 5; 19-2 at 11. Again, Johnson concedes that he cannot rebut Reed Contracting's contention that no one reported the incident to Human Resources. Docs. 17-1 at 49; 20-1 at 7. Absent evidence that Human Resources knew about these two incidents, Johnson cannot rely on the purported failure to discipline these employees to establish disparate treatment.

Johnson also cannot rely on the next two comparators he cites – William Bainer and an unnamed "Mexican" employee – whom he claims Reed Contracting failed to discharge for using racial slurs.  Apparently, Bainer, a Caucasian truck driver, told a co-worker that he "just [calls Johnson] black spider monkey." Doc. 17-1 at 11. After confronting Bainer, Johnson reported Bainer to Sterling, the trucking foreman. *Id*.; doc. 20-3 at 1. Sterling took no action, and did not report the incident to Human Resources, a fact Johnson does not dispute. Docs. 20-2 at 6; 19-1at 47. The second slur involves an unidentified employee of Mexican heritage who called a co-worker "nigger" in front of a supervisor.  Docs. 19-3 at 5; 17-1 at 19, 23.  Allegedly, the supervisor reprimanded the victim instead of the offending employee. Docs. 19-3 at 5; 17-1 at 23.  However, when this incident made it to Human Resources, the

offending employee received a one-week suspension. Docs. 17-1 at 23; 20-2 at 6. The decision to suspend, instead of discharge, is the basis for Johnson's claim that Reed Contracting treated him differently than this employee.  Johnson cannot rely on this incident or the one involving Bainer because the "quantity and quality" of the comparator's misconduct must be "nearly identical to prevent courts from second-guessing employers' reasonable decisions." *Maniccia*, 171 F.3d at 1368. Because these two incidents involved racial slurs and presumably implicated the anti-harassment policy, instead of alleged threats of violence, the offending employees are not similarly situated to Johnson in all relevant respects.

The court turns next to the final purported comparator – i.e. McKinley, whom Johnson claims is similarly situated to him.  Johnson contends that McKinley engaged in the same exact conduct as him when she purportedly cursed him and threatened to get him discharged.  The court disagrees because cursing at and threatening to get a co-worker discharged are different from threatening to kill a co-worker,  which is the allegation against Johnson.  Moreover, even if Johnson is correct that the quality and severity of McKinley's conduct matched his conduct, the court cannot disregard the reports of the witnesses, all of whom described Johnson as the aggressor. The witnesses' reports were sufficient for Reed Contracting to reasonably conclude that McKinley did not engage in any conduct that warranted discipline.  Finally, unlike Johnson who allegedly threatened two co-workers, McKinley, at best, only committed the one infraction Johnson cites. This second infraction by Johnson means that Johnson is not similarly situated to McKinley, and that he cannot rely on her to prove

a prima facie case.

However, because "establishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case," and "the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case," *see Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011), the court will assume that Johnson can make a prima facie case.[3] However, summary judgment is still warranted because Johnson failed to rebut Reed Contracting's legitimate, non-discriminatory reason for his discharge.

> B.   *Reed  has articulated a legitimate, non-discriminatory reason for the discharge*

Reed Contracting has met its burden of articulating a legitimate, non-discriminatory reason for Johnson's discharge, i.e. its contention that Johnson violated the workplace violence policy.   Although Johnson denies threatening McKinley and Nelson, Reed Contracting can still successfully rebut the presumption of discrimination if it can show that it "honestly believed [Johnson] committed the violation." *Jones*, 874 F.2d at 1540; *see also Nix*, 738 F.2d at 1186 (finding that "[even if plaintiff] may have shown that he was fired for violating a rule that he did

---

[3]Johnson alleges also that he can prove a prima facie case through evidence that he was replaced him with a white driver. Doc. 22 at 12. Reed Contracting challenges this contention, doc. 16 at 23, and notes that, between February 4, 2014 and May 15, 2015, it hired 47 drivers, seven of whom were African American. On the day it discharged Johnson, it hired an African American. Thereafter, it did not hire the next driver until fifteen days later. Doc. 19-3 at 15. Based on the record before the court, Johnson failed to establish that his specific replacement was someone outside his protected class.

not violate, . . . Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules."). As to the conduct involving McKinley, the evidence supports Reed Contracting's good faith belief. Specifically, all the identified witnesses relayed the same story, i.e. that Johnson threatened McKinley. To make matters worse, for reasons that are not clear to the court, Johnson waited until after his discharge to disclose that one person, Baker, could support Johnson's version of the incident.[4]  Put simply, when Reed Contracting decided to discharge Johnson, all the identified witnesses had described Johnson as the aggressor and painted an unequivocal account that supported McKinley's contention that Johnson threatened her.  Also, one of these witnesses added that Johnson also threatened him that day regarding that witness's involvement in the investigation.  As such, Johnson's contention that McKinley and the witnesses lied is irrelevant. As the Eleventh Circuit aptly put it, even if the complainants "were lying through their teeth[,] [t]he [relevant] inquiry . . . is limited to whether [the employer] believed that [the employee] was guilty of harassment, and if so, whether this belief was the reason behind [the employee's] discharge." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991). Stated differently, as long as Reed Contracting believed, in good faith, that the complaints were true, their accuracy is irrelevant.  *See Gerwens*, 874 F.2d at 1540 ("The law is clear that even if a Title

---

[4]The court questions whether Baker's report would have altered the decision to discharge Johnson given that Baker could only report about what he heard while he was on the phone with Johnson. Because this conversation occurred while Johnson was outside in the yard, Baker was in no position to contradict the reports about what transpired inside the operations building.

VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation.").

Significantly, Johnson acknowledges that he never provided Rice with any reason to discredit the reports against him, except to state his own personal view about their alleged inaccuracy. *See generally* doc. 17-1. While it is possible that McKinley fabricated her account of the incident, the witnesses' corroboration of her account undermines Johnson's contentions. As Rice told Johnson in the meeting Johnson surreptitiously recorded, the reports "don't sound good. Everybody's saying threatening. . . . It's like four or five [witnesses] right now saying it was threatening sounding to them, and one of them [Woods] is a supervisor so . . ." Doc. 20-7 at 11–12. In short, the multiple reports against Johnson supports Reed Contracting's contention that it had a reasonable basis to credit the complaints against Johnson and that it acted in good faith when it discharged him.

C.     *Johnson has not alleged sufficient facts to establish pretext.*

Since Reed Contracting has offered a legitimate reason for its decision to discharge Johnson, the presumption of discrimination "drops from the case" and the burden shifts back to Johnson to "create a genuine issue of material fact as to whether [the] proffered reasons for firing [Johnson] are pretext masking discrimination." *Alvarez*, 610 F.3d at 1265. In that regard, Johnson raises several contentions of pretext, which the court address separately below.

### 1.   Alleged deviation from progressive discipline policy

Johnson contends that Reed Contracting deviated from the Progressive Discipline Policy when it failed to obtain approval from its vice president or president to immediately advance to the termination stage. Johnson's interpretation of the policy ignores its general framework. Specifically, after initially outlining the progressive steps the company generally follows, the policy then states that for some offenses, Reed Contracting will proceed immediately to termination. *See* doc. 19-3 at 3. It is only after pointing out that immediate termination is an option that the policy then states that Reed Contracting can only deviate from the policy with the approval of its vice president or president. *Id.* Contrary to Johnson's contention, there was no deviation from the policy or a need to obtain approval because the policy, in fact, calls for termination when, as here, an employee engages "in certain situations . . . that could be interpreted as an immediate threat to the company or its employees." *Id.* In short, the plain language of the policy belies Johnson's contention that Reed needed to obtain the approval of its president or vice president to discharge him.

### 2.   Alleged failure to account for Johnson's non-existent disciplinary history

Johnson argues also that his discharge is pretextual because he was a good employee and that Reed Contracting should have only issued him a warning. These contentions are unavailing because courts are instructed to refrain from second guessing business decisions. *See Alvarez*, 610 F.3d at 1265 (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000)). In fact, "Title VII does not take away

an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." *Nix*, 738 F.2d at 1187. Where, as here, "the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and [he] cannot succeed by simply quarreling with the wisdom of that reason." *Alvarez*, 610 F.3d at 1265–66. Moreover, that Johnson had no prior performance infractions is irrelevant because Reed Contracting did not discharge him for purportedly accumulating too many performance infractions. It discharged Johnson instead for threatening his co-workers, including telling one in front of a supervisor that he intended to kill her. No court has the right to tell an employer that it cannot discharge an employee making such an alleged threat simply because the employee has a good performance record.

### 3.    Alleged failure to review all evidence

Johnson contends next that his discharge is pretextual because Reed Contracting failed to preserve the closed circuit video of his encounter with McKinley. Apparently, Johnson believes that the video would have supported his contentions that McKinley instigated the encounter and/or was the aggressor. There are several flaws with this contention. As an initial matter, Reed Contracting contends that it does not "review the surveillance tapes unless there has been a theft or a situation in which [it is] trying to identify somebody," doc. 20-2 at 4, and that it had no need to review the tapes here because it knew the identity of the accused. Moreover, the surveillance cameras only record video, and it is doubtful that a recording with no audio would have revealed that McKinley threatened Johnson. *See*

doc. 20-2 at 4 ("We did not review the surveillance video after incident . . . because there was no audio, and Shawn [Rice] interviewed all the witnesses.").  More importantly, a review of the security footage was unnecessary because all the witnesses confirmed McKinley's report that Johnson threatened her.  Therefore, that McKinley may have purportedly instigated the encounter does not overcome that the witnesses reported  (1) that as "[McKinley] walked by, [Johnson] started screaming at her [that she was] a fucking bitch [and that] he was going to kill her,"doc. 20-6 at 1; *see also* doc. 20-5 at 1 (Nelson stating that he heard "something that sounded like a male voice yelling and cursing in a very loud voice"), (2) that Johnson followed McKinley inside and Nelson, in turn, followed Johnson "because [he] was concerned that Mr. Johnson might physically assault Angel [McKinley] or Tammy Woods [the dispatcher]," doc. 20-5 at 1–2, and (3) that Johnson, in front of Woods, a supervisor, "was shaking with anger and continued yelling and screaming at Ms. McKinley . . . [stating] such things as Ms. McKinley 'didn't know who she was messing with,' and 'I will get you back bitch.' . . . 'I will kill you,'" doc. 20-3 at 2.

Ultimately, Johnson's references to the failure to review the video is an attack on the investigation. Indeed, in addition to the video, Johnson contends also that Reed Contracting conducted a flawed investigation because it failed to interview all possible witnesses, and that the decisionmaker relied on his subordinate's investigation instead of conducting his own investigation.  An investigation does not have to be perfect, and just because the accused proclaims his innocense does not obligate the employer to expand or extend the investigation indefinitely in hopes of

21

finding at least one person who can support the accused. *See, e.g., Sanches v. Carrollton-Farmers Branch Ind. School Dist.*, 647 F.3d 156, 170 (5th Cir. 2011)("Title IX does not require flawless investigations or perfect solutions."); *Graham v. Best Buy Stores*, 298 F. App'x 487, 496 (6th Cir. Oct. 22, 2008)("To prevail on its motion for summary judgment, Best Buy does not have to prove that Graham actually committed the alleged theft or show that its investigation was perfect; it need only show that it decided to report Graham to the police based on an honestly held belief in a nondiscriminatory reason supported by particularized facts after a reasonably thorough investigation.")(citation and quotations omitted); *Knabe v. Boury*, 114 F.3d 407, 412 (3d Cir. 1997)(stating in a case where the plaintiff challenged the adequacy of an employer's investigation into her complaints of sexual harassment that "the law does not require that investigations into sexual harassment complaints be perfect."). Likewise, there is no requirement that the  decisionmaker conduct her own independent investigation, and any contention otherwise ignores the realities of the hierarchal and departmentalized modern day workplace.  Rather, an investigation only needs to be free of discriminatory bias and involve all relevant witnesses. In this case, Rice met with Johnson, Johnson's accuser, and the three identified witnesses. All three witnesses corroborated McKinley's report and conveyed that Johnson threatened McKinley. Moreover, the witnesses' reports match the information Rice transmitted to the decisionmaker, and, as a result, Wilkinson had all the relevant information he needed to act. While Johnson has every right to disagree with the witnesses or the investigation, that disagreement does not establish

pretext.

4.   Alleged shifting rationale for discharge

Johnson also seems to claim that Reed Contracting added a second reason (the threat against Nelson) for the discharge after-the-fact and/or challenges the decision to rely on Nelson's complaint because Johnson never received an opportunity to respond. These contentions are unavailing because, as an initial matter, Rice could not have raised an allegation he did not know about when he met with Johnson. Moreover, the record supports Reed Contracting's position that it knew about this second threat before it discharged Johnson. Indeed, Rice included the threat against Nelson in the investigation summary he drafted for Wilkinson. Rice's failure to mention this allegation to Johnson as one of the reasons for Johnson's discharge does not establish pretext or that the threat did not factor in the discharge. *See Tidwell v. Carter Products*, 135 F.3d 1422, 1428 (11th Cir. 1998) ("[E]xistence of a possible additional non-discriminatory basis for an employee's termination does not necessarily prove pretext. If an employer offers different reasons for an employee's discharge, that does not necessarily mean the original proffered reason was pretext."). While it may be unfair for an employer to rely on an incident it did not disclose to the employee, "Title VII [and Section 1981] address[] *discrimination*. Title VII [and Section 1981] . . . [are] not a shield against harsh treatment at the work place." *Nix*, 738 F.2d at 1187 (emphasis in original) (internal quotation and citation omitted). In fact, an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a

23

discriminatory reason." *Id.* at 1184.  In other words, while perhaps harsh and unfair, there is nothing discriminatory about Reed Contracting's failure to disclose to Johnson Nelson's complaint or that it relied on it in its decision to discharge Johnson.

5.   Alleged imputation of bias

Finally, Johnson argues that Rice orchestrated his discharge because "Rice mistook assertiveness for aggression . . . [and] was more concerned with making sure [Johnson] knew his place than with finding out what [Johnson's] side of the story was." Doc. 22 at 23–24. This purported racial bias by Rice allegedly infected Wilkinson's decision to discharge Johnson.  In this Circuit, "a 'cat's paw' theory of recovery may apply when a biased actor recommends that an adverse employment action be taken against an employee, [even though] the biased actor is not the ultimate decision-maker." *Williamson v. Adventist Health Sys./Sunbelt. Inc.*, 372 F. App'x 936, 938 (11th Cir. 2010) (citing *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir.1999)). Johnson's attempt to blame Rice for his discharge is unfounded speculation that has no factual support. *See Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005)("Speculation does not create a genuine issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.") (citation omitted). As Rice testified, and as his report to Wilkinson shows, he did not recommend that Wilkinson discharge Johnson; he simply presented his investigation findings. Moreover, there is no credible evidence to support that Rice had a discriminatory bias against Johnson, except for Johnson's reliance on Rice's statement that Johnson not tell Rice how to do Rice's job.  Rather

24

than establishing racial bias, this statement may well just be proof that Rice has a control disorder, is insecure about his job duties, or was simply frustrated with dealing with a difficult employee. To read discriminatory animus into this comment would require the court to make impermissible and unsubstantiated assumptions, which the court declines to do. *See, e.g., Standard v. A.B.E.L. Servs.*, 161 F.3d at 1330 ("Direct evidence is evidence that establishes the existence of discriminatory intent . . . without any inference or presumption."). In short, because there is no proven bias by Rice or evidence that Rice made a recommendation that Wilkinson discharge Johnson, the cat's paw theory does not carry the day.

## IV. CONCLUSION

This court's "purpose is not to determine whether the employer's decision was prudent or fair, but is to determine whether an unlawful discriminatory animus motivated the employment decision. Stated differently, pretext is not present unless it is shown both that the reason was false, and that discrimination was the real reason." *Johnson v. Switch Data Mgmt. Co.*, 199 F. App'x 834, 835 (11th Cir. 2006) (internal citations and quotation marks omitted); *see also Alvarez,* 610 F.3d at 1267 (plaintiff must "show not just that [defendant's] reasons for firing her were ill-founded but that unlawful discrimination was the true reason."). Based on the record before this court, Johnson has not carried his burden of establishing that the articulated reason is false or that discrimination was the real reason for his discharge. Accordingly, his claims fail, and Reed Contracting's motion for summary judgment, doc. 15, is due to be granted. A separate order consistent with this opinion will be

entered contemporaneously.

      **DONE** the <u>28th</u> day of September, 2016.

                                        **ABDUL K. KALLON**
                              UNITED STATES DISTRICT JUDGE